UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - EASTERN DIVISION

| | |
|---|---|
| C.S.M., Plaintiff, | Case No. 5:26-cv-01144-JWH |
| vs. | Los Angeles, California |
| RUBY HERNANDEZ, et al, Defendant. | Friday, March 20, 2026 |
| | 8:33 a.m. to 9:22 a.m. |

TRANSCRIPT OF SETTLEMENT CONFERENCE
BEFORE THE HONORABLE JOHN W. HOLCOMB
UNITED STATES DISTRICT COURT

Appearances: See next page.

Court Reporter: Recorded; CourtSmart

Courtroom Deputy: CLARISSA LARA

Transcribed by: JON MICHAEL JONES, CSR 15115
Huntington Court Reporters and Transcription, Inc.
301 North Lake Avenue
Suite 600
Pasadena, California 91101
(800) 586-2988

Proceedings recorded by electronic sound recording; transcript produced by transcription service

APPEARANCES:

For the Plaintiff C.S.M.:

STEPHANIE PERIBAN
Immigration Defenders Law Center.
634 South Spring Street
10th floor
Los Angeles, CA 90014
213-204-3881.

CAITLYN JOLLEY
Immigration Defenders Law Center
634 South Spring Street
10th Floor
Los Angeles, CA 90014
213-282-3133

For the Defendant Ruby Hernandez, et al.:

ALEXANDER LAYNE FARRELL
AUSA - Office of US Attorney
Civil Division.
300 North Los AngeleS Street, Suite 7516
Los Angeles, CA 90012

WITNESSES

| | PAGE |
|---|---|
| M.P.S.M. | 20 |

Los Angeles, California; Friday March 20, 2026

--o0o--

(Call to Order)

THE CLERK: All rise and come to order. This court is now in session.

Your Honorable John W. Holcomb, United States District judge, presiding.

THE COURT: All right. Good morning, everybody. Please have a seat.

THE CLERK: Calling Item Number 1, Case Number 5:26-cv-01144, C.S.M vs. Ruby Hernandez, et al.

Counsel, please state your appearances for the record, beginning with petitioner.

MS. JOLLEY: Caitlin Jolley, appearing pro bono, Your Honor, on behalf of petitioner, along with my colleague, Ms. Periban.

THE COURT: Ms. Jolley and Ms. Periban, good morning to you.

MS. PERIBAN: Good morning.

MR. FARRELL: Good morning, Your Honor. Assistant United States Attorney Alexander Farrell on behalf of the Government.

THE COURT: Mr. Farrell, good morning.

All right. We're here on -- and I note that

petitioner herself is here, C.S.M.

MS. JOLLEY: Correct, Your Honor.

THE COURT: So welcome. I'm glad that you're here.

Is M.P.S.M. here?

MS. JOLLEY: She is, Your Honor. She's seated in the front row of gallery.

THE COURT: Okay. We're here on petitioner's ex parte application for a temporary restraining order, in particular, an order from me releasing C.S.M. from the custody of the ORR to the custody of her sister.

Now, there was a little bit of confusion in the papers, at least from my -- as far as I could tell.

Is -- and Ms. Jolley, would you stand at the lectern, please.

MS. JOLLEY: Yes, Your Honor. One moment.

THE COURT: Obviously take all the papers that you need with you.

MS. JOLLEY: Thank you.

THE COURT: Today we don't have a court reporter. We have a skilled professional that's operating our recording equipment. But a record will not be made unless you're speaking into a microphone. And I don't want you to be uncomfortable standing up and leaning over. So I think it's better at the lectern.

Thank you very much.

MS. JOLLEY: You're welcome. Thank you, Your Honor.

THE COURT: Okay. Is M.P.S.M. the sister or aunt of C.S.M.?

MS. JOLLEY: She is the sister. Confirmed, biological sister.

THE COURT: When you say confirmed, I think that's a big question here. When you -- what do you mean by confirmed?

MS. JOLLEY: That's fair, Your Honor. It's not a big question on our end, and I'm unsure where the confusion arose on respondent's end. And so I'd just like to address that.

THE COURT: Please.

MS. JOLLEY: They are biological sisters. They share parents. They have the same last name. Their birth certificates confirm that. Our M.P.S.M. has submitted a declaration that is included in our reply stating she's the biological sister, stating that she has held out that she is the biological sister. She is not the aunt.

I think importantly for our purposes today, ORR categorizes these sponsors in multiple categories. A sister and an aunt share the same category. So again, she is the sister. But even if she were the aunt, or there

were some confusion, it's irrelevant. It doesn't materially change the analysis at all here, Your Honor.

THE COURT: I understand. But if M.P.S.M. represented that she was an aunt the first time that she was -- that she contacted or was contacted by ORR officials and then changed the story that raises a concern.

MS. JOLLEY: I understand. That's fair, Your Honor. Of course that would raise a concern of credibility, a changing story. That's not the case here. If anything, it could be a language barrier; it could be an internal mistake. I don't know. I don't want to speculate to how that error occurred in ORR's files. But she has sworn a declaration under perjury that has been submitted to Your Honor stating that not only is she the sister but that she did not hold herself out as the aunt at any point.

THE COURT: Okay. Now, ORR has -- there's a statute or statutes. There are regulations. There's a UAC policy guide, as I understand it.

MS. JOLLEY: Uh-huh.

THE COURT: The ORR -- the Government has a set of protocols that the Government follows in situations like that -- like this, when we have a child, a minor, who comes into the country unaccompanied at the time of entry

to make sure that the child is not released to someone to whom the child should not be released to.

And that seems to me like a good thing --

MS. JOLLEY: Agreed.

THE COURT: -- in general.

Now, from your perspective, does everybody agree that when it can be confirmed -- put aside how.

MS. JOLLEY: Uh-huh.

THE COURT: When it can be confirmed definitively that M.P.S.M. is the sister of C.S.M., that C.S.M. is going to be released into M.P.S.M.'s custody; does everybody agree that's going to happen when it's confirmed?

MS. JOLLEY: That is what we're here asking Your Honor to confirm today. That's an ORR decision. I represent the child. And is it in the child's best interest for her to be released? Absolutely. The sister piece, again, I would argue, has been confirmed, Your Honor. And if it is an outlying concern, I just want to reframe one thing that Your Honor said.

THE COURT: Yes, please.

MS. JOLLEY: I think it's important to note here what's law and what's policy. The TVPRA is law. The foundational rule has been codified and is law. Policy is what it sounds like: This is a moving target, they are

dealing with real world facts, ORR has to promulgate its own policies and guidelines. We don't dispute that.

That being said, the TVPRA and the foundational rule are laws, and they provide the timing mechanisms, importantly. Also, I want to move away from the acronym world for just a moment and remind us that the TVPRA is the Trafficking Victims Prevention Reauthorization Act.

So their job is not necessarily to just make sure they go to a good sponsor. Of course we want that, and their job is to vet sponsors. Their job is to make sure that the sponsor's identity is confirmed and that they are not at risk for trafficking. There is no risk of trafficking here. And if there is, as the child's attorney, I should know that. I don't represent the sponsor; I represent the child. And releasing her to her sister is in the best interest under the law. Certainly their self-promulgated policies should not contradict that law.

THE COURT: Okay. I think I understand your position. Let me talk to Government's attorney for a moment, and then I'll give you a chance to respond and make any other argument that you wish to.

MS. JOLLEY: Okay. Thank you, Your Honor.

MR. FARRELL: Good morning, Your Honor.

THE COURT: Good morning, Mr. Farrell. So let

me ask you the same question.

Your clients agree, respondents here, that C.S.M. should be released to the custody of M.P.S.M. as soon as it's conclusively determined -- whatever that may mean -- or established that they are sisters.

MR. FARRELL: Yes, Your Honor. And -- and the declaration that we provided with our opposition confirms that in -- in paragraph --

THE COURT: Okay.

MR. FARRELL: -- 35.

THE COURT: So what's the holdup here?

MR. FARRELL: The holdup here, Your Honor, is, you know, it's -- it's a, you know, this is -- this is not a typical habeas case, and there's processes that have to go through in order to verify the identifications.

My colleague mentioned that it's confirmed that it's -- that the sponsor is the sister. But the reason why we're -- why the agency is doing the DNA test is to actually have that confirmation. It's not -- it's not sufficient enough for the agency just to have a declaration in a court filing. And that's why we're going through the DNA process.

But, you know, this case can easily be resolved by next Friday. You know, the declaration states that, you know, absent some circumstance -- that I don't

expect -- and from my conversations with the agency, they're confident that this is going to be a -- this is a streamlined process. It's simply, you know, I believe the parties are on the five-yard line of the football field, and it's just finishing up this last piece with the internet background check and the DNA -- the DNA testing, getting the results back.

THE COURT: It seems like it's taken an inordinately long period of time though.

MR. FARRELL: Your Honor, and I think the declaration, you know, addresses that in terms of from the time that there were a number of household members in the sponsor's home that had to do background checks or had to do fingerprinting. And some of those fingerprinting appointments were then rescheduled, which then caused some delay.

There was also a bit of delay with contacting the sponsor, in which the field -- the federal field specialist tried to contact the sponsor in January. But I think, from her -- from the sponsor supplemental declaration, it seems that she changed her phone number. So there was some delays in that regard.

But ultimately, Field Guide 24, which was -- which was revised after Field Guide 27, states that only after the ORR has received the results of all background

checks that the ID check is then scheduled and that ID check is where the -- where the DNA testing is done.

So, you know, from the Government's perspective, you know, I think the record shows that the Government has been diligent. The Government is -- the Government acknowledges the sensitivity of -- of a minor in custody. But I think the results of this case -- I think the anticipation -- the anticipated end result of this case, you know, based on -- based on what's been attested to in the declaration that we've provided, you know, shows that, you know, the Government just needs a couple more days to -- to just effectively finish the paperwork. And then, you know, ultimately, absent some outside circumstance that I'm not -- that I don't expect, you know, the -- the minor would be released on the 27th.

THE COURT: The --

MR. FARRELL: Or, sorry, Your Honor, by the 27th. So it could actually occur --

THE COURT: Hold on.

MR. FARRELL: Sorry.

THE COURT: The results of the DNA test are due back on the 24th; is that correct?

MR. FARRELL: Correct.

THE COURT: And obviously this is comparing the DNA of C.S.M. and the DNA of M.P.S.M.; correct?

MR. FARRELL: Correct.

THE COURT: Just to confirm that they are indeed sisters?

MR. FARRELL: Correct.

THE COURT: Everything else is squared away? You said you had to take fingerprints and do background checks on the other occupants of MPSM's home; is that correct?

MR. FARRELL: Correct, Your Honor. Those have come back clear. There is an internet background check pending for the sponsor. But that --

THE COURT: What does that mean?

MR. FARRELL: I think -- Your Honor, I'm not entirely sure what that entails. But from the -- from the declaration, I -- my understanding is that all of this will be done on or before the 27th. So -- so by next Friday.

THE COURT: Walk me mechanically through what you think is going to happen on the 24th. Is this DNA check test? Does this come back something that's mailed to an agency? Is this something that's online?

MR. FARRELL: I -- I'm not entirely sure. But I think given the timeline of -- of the -- given the specificity that is in the declaration, I believe that it should be available electronically. But I don't have

personal knowledge that --

THE COURT: And who gets that?

MR. FARRELL: I believe the field -- the federal field specialist.

THE COURT: So one of the two -- first two named respondents, Ms. Hernandez or Ms. Himel?

MR. FARRELL: Yes. Or -- or someone else at ORR. But because they've done the -- they will be getting the results. It's not -- I don't believe it's going to, like, some third party that's going to be holding on to it for days or anything like that. I think the declaration -- given the specificity of the declaration, saying that they expect it by the 24th means that they're going to be getting it promptly and making prompt decisions, you know, thereafter.

THE COURT: This is the specificity you're referring to: The declaration of Toby -- Toby Biswas?

MR. FARRELL: Yes. And in --

THE COURT: He's in Washington.

MR. FARRELL: Yes.

THE COURT: He's not even here.

MR. FARRELL: Correct.

THE COURT: So how does he know these things?

MR. FARRELL: ORR has a database of a case file, and so they're able -- which has, you know, numerous

individuals and components inputting information regarding this case. And that's how he was able to review these records.

THE COURT: And I started to ask, walk me through what's going to happen here. You're a little unclear about how the DNA test results will be received. By whom? Let's say they come in on the 24th to somebody, you're not sure who, and it is confirmed that C.S.M. and M.P.S.M. are sisters. Then what? What's the very next step?

And let's assume that this internet search check, which you don't even know what it is, let's say that that is clear. What's -- what will happen later on the 24th, the 25th, the 26th, the 27th? In other words, why is it going to take so long if there's one piece of information that respondents are waiting on? Why can't somebody give a phone call to M.P.S.M. or to counsel here and say check is good. M.P.S.M. can pick up C.S.M. -- in Fullerton; right?

MR. FARRELL: Yes, Your Honor. I think there is some -- I believe there's -- there will still be some administrative processing. I don't know the specifics of that but, you know, it would be the confirmation from ORR; then communicating with the foster care system; then allowing them to release. You know, as soon as I get the

information, Your Honor, I'm happy to provide a status update to the Court on that. I've been in contact with --

THE COURT: This has taken far too long. I appreciate that the Government wants to be careful and make sure that unaccompanied minors are not released to people to whom they should not be released. Nobody wants that. But in this circumstance, as soon as it is clear that -- that M.P.S.M. is C.S.M.'s sister, and all of your other checks you're telling me have cleared, this should happen very, very quickly. Shouldn't be another three days or more.

You agree? I don't understand why -- everybody wants this to happen.

MR. FARRELL: Sure.

THE COURT: OJ Got released from jail in minutes. I don't understand why this child can't be released to her sister just as quickly, as soon as it's -- as soon as it's clear that that's the appropriate thing to do.

MR. FARRELL: Sure, Your Honor, and I appreciate the Court's concern. And I share that as well. You know, I would say that, you know, this 27th date is the, I think, the extreme measure. It's the -- it's -- I think the way that the declaration is attested to, it's -- it's by -- as soon as -- I think it could be earlier than

March 27th. But from my conversations with the agency -- which I had a conversation with them this morning on my way in -- you know, they expect the release to the sister.

So, you know, it certainly can be -- it could happen earlier than the 27th. You know, the Government is just -- the Government's asking to be allowed to fully complete its -- its process absent a TRO today. That would be, you know, which is the -- which is being what's asked by the petitioner. So...

THE COURT: I understand. Anything else you want to tell me?

MR. FARRELL: Just one last point. In the alternative, if the Court is not ready to enter a TRO today, you know, the Government would just ask that, you know, we do have an opportunity to provide that status report to the Court to, you know, advise them. So if that needs to come earlier than -- than March 30, you know, I'd be open to the Court's, you know, suggestion and guidance on that.

THE COURT: I understand. Okay.

MR. FARRELL: Thank you.

THE COURT: Thank you very much.

Ms. Jolley, I'll -- I'll be transparent here. What I'm -- what I'm leaning toward is waiting another four days to make sure this DNA sample, DNA test, comes

back as I think we all expect that it's going to. I think it's extremely important that unaccompanied minors not be released to the wrong people. I don't think that M.P.S.M. is the wrong people. I think she's the right people. But one more -- one more piece of information to confirm that as, I'm weighing things, I think is appropriate. But I'm listening. Please tell me.

MS. JOLLEY: I appreciate your transparency, Your Honor, and I hope you will let me change your mind. Because that is not what this case requires. My concern, hearing respondent's argument, is that they continue to muddle the facts to create an issue that does not exist here, and based on a policy they created that swallows and violates the law promulgated by Congress.

We're losing the thread. My child is suffering irreparable harm due to constitutional violations, due to violations of the TVPRA. It's nonsensical to say we have to let them do their job under the TVPRA while they violate it. The foundational rule, not us, provides the timing mechanisms here. Under that rule, a Category 2 sponsor, like my client's sister, has 14 days. They have 14 days to review that application.

That application, by their own admission, was complete in October of last year. They then have a safeguard, the foundational rule has a safeguard, and that

is a 90-day higher review for complicated cases. The purpose of this law is to place these children, who are in immigration proceedings, immediately, promptly. That is a mandate. They shall release them.

In order to do that, they must confirm the identity and that there is not a risk. Furthermore, they have to determine that the child is not a flight risk, a danger to herself or the community. None of that exists, Your Honor. The irreparable harm does exist, and it's ongoing. Ninety days would have been mid-January. Please.

THE COURT: But you did say they have to confirm the identity.

MS. JOLLEY: Yes, and if I may, Your Honor, that is speaking about ORR's task generally. In this case, they've done that. They have fingerprints. They have a birth certificate. They've had that since September, October of last year. The DNA testing they are talking about is a red herring for a few reasons, Your Honor. First, it's not law. This comes from their own field guide, as respondent cited. The Field Guide 27 was first issued March 14th, 2025, and then it's been updated since then.

They are the ones saying a birth certificate's not good enough. Fingerprints are not good enough. I'm

unsure why there is a presumption she's not the sister. My child's mother -- or my client, who is the child's mother, died March 1st. She was in detention. Her sister had to travel for the funeral, try to continue to be her sponsor, and deal with all of this at once. I don't think there's a genuine concern about the familial connection or the identity. And the facts demonstrate that. The DNA test they're talking about has been pending, by their own admission, since November, two days after this litigation was filed. That DNA test was scheduled, Your Honor.

THE COURT: Well, say that again. When was it scheduled?

MS. JOLLEY: It was scheduled and has been completed; right? March 13th and March 16th. Each of the participants, the child and the sponsor, had to give DNA. That's completed March 13th, March 16th. We filed March 11th. They ignored our demand letter December 23rd asking about scheduling the DNA test. They can't save themselves from these constitutional violations now by saying we're on the fifth yard line when the game clock has expired. They had 90 days under the law to take care of this, Your Honor. Why is the birth certificate not good enough? Why is the fingerprints not good enough?

The DNA test is their own policy guide. And if the policy guide is slowing things up so much that they

can't meet the timing standard in the foundational rule, which is codified, then it is the problem. Importantly, my client -- my client is engaged in immigration proceedings. Those have been continued four times. My colleague can't even assess her relief in immigration court until she is reunified because it precludes certain relief.

THE COURT: That's -- that's not a part of this habeas petition.

MS. JOLLEY: It's part of the -- that's fair, Your Honor. It is part of the irreparable harm.

THE COURT: Okay. I understand. I understand why you're raising it. I just want to make sure that it's not -- well, as I said, part of this petition. Part of the relief that you're seeking through this petition.

MS. JOLLEY: Well, and so to address your transparent point. To give them more time ratifies their violation of the due process clause of the constitution and the TVPRA. We have put forth evidence. M.P.S.M. has gone through every request, including an in-person ID check, a background check, a fingerprint.

The household members were fingerprinted in September and October of last year, Your Honor. They can't represent a delay when they have rested on their laurels, ignored our demand letter, and now act because a

TRO is pending.

THE COURT: Will M.P.S.M. consent to be sworn and testify right now?

MS. JOLLEY: May I confirm with her? And she does need translation, Your Honor.

THE COURT: I understand.

MS. JOLLEY: Maria, can you help me?

She consents to that, Your Honor.

THE COURT: Okay.

MS. JOLLEY: Will Your Honor do questioning? Should I move from the lectern?

THE COURT: I intend to ask some questions, but I'll let counsel ask questions as well.

MS. JOLLEY: Thank you, Your Honor.

THE COURT: Madam Clerk, could you help M.P.S.M. to the witness stand, please.

MS. JOLLEY: Your Honor, where would you like our translator to stand?

THE COURT: Right next to the witness.

MS. JOLLEY: I want to make sure her answer's recorded for the record.

THE COURT: Yes. So would you -- we have a microphone. Could you get the microphone for the translator, please?

MS. JOLLEY: Thank you.

THE COURT: Madam Translator, could you state your name for the record, please?

THE INTERPRETER: Maria Savaleta.

THE COURT: What are your qualifications to be a translator?

THE INTERPRETER: Well, I'm -- I'm an attorney with Immigrant Defenders Law Center. And I am fluent in Spanish and English, and I can, you know, translate verbal written Spanish to English, English to Spanish.

THE COURT: Very well. Any objection from respondents?

MR. FARRELL: No, Your Honor.

THE COURT: Okay. Madam Clerk, could you please administer the oath to M.P.S.M.?

THE CLERK: Please stand and raise your right hand.

Do you solemnly swear that the testimony you shall give in the cause now before this court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: Yes.

THE CLERK: Thank you. If you would please state and spell your first and last name --

THE COURT: Let's -- we'll proceed anonymously. Any objection?

MR. FARRELL: Your Honor, can the translator be sworn in as well?

THE COURT: Yes. Do you have the translator oath?

THE CLERK: Yes.

THE COURT: Okay. Thank you, Mr. Farrell.

THE CLERK: Please raise your right hand.

Do you solemnly swear that you will well and truly interpret from the English language into the Spanish language and from the Spanish language into the English language, in the cause now before the Court, according to the best of your knowledge and ability, so help you God?

THE INTERPRETER: I swear, yes.

THE COURT: Thank you. Okay.

THE COURT: Ma'am, so you are referred to as M.P.S.M. in this lawsuit. Do you understand?

THE WITNESS: Yes.

THE COURT: And do you understand that the -- the minor sitting at plaintiff's counsel table is referred to as C.S.M.?

THE WITNESS: Yes.

THE COURT: Are you and C.S.M. sisters?

THE WITNESS: Yes.

THE COURT: And how old are you, please, ma'am?

THE WITNESS: Sorry, Your Honor. Give me a

second. She's 25.

THE COURT: In what city do you live? Don't give me your address. Just the city.

THE WITNESS: Laguna Niguel.

THE COURT: And are you employed?

THE WITNESS: Yes.

THE COURT: How many people live in your household?

THE WITNESS: Five people.

THE COURT: And don't give me their names but give me their relationship to you.

THE WITNESS: My brother-in-law, my son, my husband and a friend of the -- of -- of -- us. Of our family.

THE COURT: How old is the friend of the family?

THE WITNESS: 35.

THE COURT: And is that a -- a man or a woman?

THE WITNESS: It's a man.

THE COURT: And why does -- generally, why does he live in the home with you?

THE WITNESS: Because we know each other from a long time. And he also knew my mom and my parents.

THE COURT: Now, what is your occupation?

THE WITNESS: Waitress.

THE COURT: And you mentioned husband. Is your

husband employed?

THE WITNESS: Yes.

THE COURT: What is your husband's occupation?

THE INTERPRETER: Sorry, can I clarify, Your Honor?

THE WITNESS: Chef and manager also.

THE COURT: And the -- the 35-year-old who's living in the home, is that person employed?

THE WITNESS: Yes.

THE COURT: And what does that person do?

THE WITNESS: Electricity.

THE COURT: Do you own the home or are you renting?

THE WITNESS: We rent.

THE COURT: Are there any firearms in the home?

THE WITNESS: No.

THE COURT: Does anyone use illegal drugs in the home?

THE WITNESS: No.

THE COURT: Does anybody abuse prescription drugs in the home?

THE WITNESS: No.

THE COURT: And you understand that you're under oath, so you're -- so you're obligated to tell the truth; correct?

THE WITNESS: Yes.

THE COURT: Mr. Farrell, do you have any questions for the witness?

MR. FARRELL: No, not at this here time -- not at this time, Your Honor, thank you.

THE COURT: Ms. Jolley, do you have any questions?

MS. JOLLEY: Do you believe that you are --

THE COURT: Stand at the lectern, please.

MS. JOLLEY: Apologies, Your Honor, yes.

Are you capable and willing to provide for the physical and mental well-being of your sister, C.S.M.?

THE WITNESS: Yes.

MS. JOLLEY: No further questions, Your Honor.

THE COURT: All right. May this witness be excused? That is, do you have any cross-examination?

MR. FARRELL: No, Your Honor. Thank you.

THE COURT: All right. Thank you, ma', am. You may be -- you may be excused. You may return to your seat in the gallery.

THE WITNESS: Thank you.

THE COURT: Thank you, Madam Translator.

All right. Any more argument?

Can you pick up -- what is her name? -- Sheba, Sheba. Can you pick up the microphone that's over at the

sidebar?

Okay. All right. Let me see, Counsel. All right. Any further argument?

Mr. Farrell, do you have anything else?

MR. FARRELL: Just one comment, Your Honor. I -- I -- I appreciate the Honor -- Your Honor -- taking the time to hear this motion today. And I am going to convey the Court's concerns to the agency to help expedite this process.

THE COURT: All right. Let me ask a mechanical question again. If I grant this TRO, how quickly -- how quickly can your clients release C.S.M. to the custody of M.P.S.M.?

MR. FARRELL: I -- I don't have a specific time frame. But as soon as the -- if an order would come out granting the TRO, my process is, you know, contacting ORR and having them, you know, expedite this and then contact the foster home and -- and coordinating that. So it -- it -- I -- I just don't have a specific time timeline. But, you know, given the sensitivity of this, you know, I would ask, you know, my agency contacts and the foster home to work as expeditiously as possible.

THE COURT: All right. Anything else?

MR. FARRELL: No, Your Honor.

THE COURT: Anything further from you, Ms.

Jolley?

MS. JOLLEY: Yes, Your Honor. May I be heard just to make a small correction to the record?

THE COURT: Please.

MS. JOLLEY: I just want to call your -- Your Honor's attention to some factual pieces that came out in the testimony of M.P.S.M.

You inquired about the individuals living in her household, and I just want to flag for Your Honor that by respondent's own admission, those people -- her husband -- was fingerprinted on October 16th --

THE COURT: Yes --

MS. JOLLEY: -- the household member, 22nd of October, and then the friend on the 31st.

The other individuals in the home are children, and the fingerprinting and background check requirement only applies to adults. I would just like that to be factually clear.

And then, importantly, when respondent spoke, I believe he misspoke a little bit about the process because it is a very bureaucratic process here. Saying that one of the named defendants is who makes the decision if we wait on the DNA test, there are two field agents that receive those DNA tests. One receives the results for the child. A different field agent receives the adults -- the

results for the sponsor.

They are -- the child field agent Hernandez will receive those. The sponsor is field agent Gast. And so they will then have to coordinate, and then there are layers of supervision. And so I don't think Counsel is being -- or respondent is being disingenuous by saying he doesn't know how long this will take because that puts us into a new nebulous morass of how long it will take.

But by his own admission, a TRO would behoove them and require them, under law, to move immediately to reunify this child with her sister.

Nothing further, Your Honor.

THE COURT: All right. I'm prepared to rule on this matter. I'm going to grant the application for a TRO. I'm going to direct respondents to release C.S.M. into the custody of M.P.S.M. forthwith, which I expect to be right now.

Any objection to that, Ms. Jolley?

MS. JOLLEY: No, Your Honor. Thank you for your careful consideration of this matter.

THE COURT: Let me give my reasons. The minute order memorializing this hearing will say, for the reasons stated in open court, the TRO is granted. Respondents are directed to release C.S.M. into the custody of M.P.S.M. forthwith. Respondents are directed no later than

March 24 to file a status report advising the Court regarding the outcome of the DNA test and the outcome of any other investigation regarding M.P.S.M. and M.P.S.M.'s -- the issue of C.S.M. being released into M.P.S.M.'s custody.

You mentioned an internet test, for example. So give me a status report telling me all about that. The minute order will state this more -- more succinctly. But that's -- that's the gist of what I'm going to order.

I'm going to set a hearing on a preliminary injunction for next Friday, the 27th, also at 8:30 a.m. If that's unnecessary because petitioner has obtained all the relief that she seeks, you can certainly, Ms. Jolley, file paperwork, for example, stipulation or a notice under Rule 41(a)(1) that you're dismissing the petition or, if not, if there's other relief that you seek, I do note that you're seeking attorney's fees. I don't know if you want to pursue that or not.

But in any event, I'll set a hearing on a preliminary injunction for next Friday, the 27th, at 8:30 a.m.

MS. JOLLEY: Thank you, Your Honor.

THE COURT: Now, my reasons for granting this TRO. We all know the Winter factors. I find here that petitioner has satisfied the Winter factors. Likelihood

of success on the merits. The only piece it appears to me that respondents are waiting on is this DNA test. From the representations made to the Court that are not objected to and the testimony provided by M.P.S.M. and C.S.M. -- C.S.M., of course, was not under oath, she's a minor. But I did speak with her at sidebar. I find that petitioner is likely to succeed on the merits of her procedural due process claim.

Second Winter factor is that the plaintiff will likely suffer irreparable harm in the absence of preliminary relief. Constitutional deprivations of -- of liberty are by definition irreparable harm, even though I was contemplating waiting four days. But I don't think we need to wait four days based upon my findings. And I do find that in the absence of this relief, C.S.M. would continue to suffer irreparable harm.

The balance of the equities. I do appreciate that the Government has an obligation to ensure that minors are not released into the custody of people to whom they should not be released into the custody of. But I'm -- and I'm balancing that against my findings that M.P.S.M. really is C.S.M.'s sister and does want to take custody of C.S.M. So the balance of the equities I find tip in favor of the petitioner.

The public interest factor number four favors

this relief because the public has an interest in ensuring that families are united. So finding that all four factors favor petitioner, as I said, I'm going to grant this TRO.

Madam Clerk, do you have all the elements that we need for our minute order? Okay. I'll get that issued as soon as possible. But perhaps counsel can talk about the mechanics of really getting C.S.M. into MPSM's custody now, now, now.

MS. JOLLEY: Absolutely. Thank you, Your Honor.

THE COURT: All right. And you all -- so I look forward, Mr. Farrell, to that report on the 24th. You're telling me the -- you're going to get the DNA test results on the 24th. So by the end of the day, file that. In the extremely -- well, in the event that the test results come back negative, I want to know that right away, of course, because we may need to take some extraordinary action.

You understand?

MR. FARRELL: Yes, Your Honor.

THE COURT: Okay. So I'll see you -- if anybody wants to file anything after the 24th, in advance of the hearing on the 27th, feel free to do so. You're granted leave to file any supplemental papers that you wish to file. If we don't need a hearing on Friday, talk to each other and stipulate to take it off calendar because you've

resolved things or you've dismissed the petition. But if we need a hearing, we'll have it at 8:30. If there's anything I need to know, please -- please file a supplemental brief letting me know in advance of that hearing. So let me set a deadline of 9:00 a.m. on the 26th for any supplemental briefing.

All right. What else do we need to accomplish in this case? Ms. Jolley, anything else?

MS. JOLLEY: Today, Your Honor, nothing else. Everything's been covered. Again, thank you for your attention in this matter. We appreciate it.

THE COURT: Mr. Farrell?

MR. FARRELL: Nothing else, Your Honor. Thank you.

THE COURT: Okay. Before -- I think people for our 9:00 a.m. -- counsel for our 9:00 a.m. matters need to check in. So I'm going to take a short break.

Thank you very much.

MS. JOLLEY: Thank you.

THE CLERK: All rise. This court is in recess.

-o0o-

TRANSCRIPTIONIST'S CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

JON MICHAEL JONES, CSR NO. 15115

March 25, 2026
Date

FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:

/s/Jon Michael Jones

JON MICHAEL JONES, CSR NO. 15115,
Huntington Court Reporters and Transcription, Inc.